## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

| | | |
|---|---|---|
| CHARLENE JONES, On Behalf of Herself and All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | Case No. 3:16-cv-00210 |
| v. | ) ) | **CLASS ACTION COMPLAINT FOR** |
| | ) | **VIOLATIONS OF SECTIONS 14(a)** |
| ACCURIDE CORPORATION, | ) | **AND 20(a) OF THE SECURITIES** |
| RICHARD F. DAUCH, JOHN W. | ) | **EXCHANGE ACT OF 1934** |
| RISNER, ROBERT E. DAVIS, LEWIS | ) | |
| KLING, ROBERT J. ADAMS, KEITH | ) | **JURY TRIAL DEMANDED** |
| E. BUSSE, and JAMES R. RULSEH, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Charlene Jones ("Plaintiff") by her undersigned attorneys, for this Class Action Complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action on behalf of the public stockholders of Accuride Corporation ("Accuride" or the "Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants"),as a result of their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") in connection with a proposed transaction announced on September

1

2, 2016 (the "Proposed Transaction"), pursuant to which Accuride will be acquired by funds managed by Crestview Partners L.L.C. ("Crestview"), a leading New York based private equity firm, and will become a private entity.

2.     On September 2, 2016, the Board caused Accuride to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger, Accuride will merge with and into Armor Merger Sub Corp. ("Merger Sub"), a wholly-owned subsidiary of Armor Parent Corp. ("Parent" and together with Merger Sub, "Armor"), Merger Sub's sole shareholder, and an affiliate of Crestview. Accuride will continue as the surviving corporation.

3.     Pursuant to the terms of the Merger Agreement, stockholders of Accuride will receive $2.58 per share in cash for each share of Accuride common stock. Following the consummation of the Proposed Transaction, Accuride will remain an independent global company with continuity of leadership, business units and worldwide operations.  The Company will continue to operate under its current brand name and remain headquartered in Evansville, Indiana, with operations in the United States, Canada, Mexico and Italy.  President and Chief Executive Officer ("CEO") Rick Dauch ("Dauch") and the members of the Accuride Leadership Team will continue to lead the business after the transaction closes.

4.      The Proposed Transaction is the product of a flawed process and deprives Accuride's public stockholders of the ability to participate in the Company's long-term prospects.

5.     Compounding the unfairness of the Proposed Transaction, defendants

issued materially incomplete and misleading disclosures in the Schedule 14A Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") on September 30, 2016. The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

6.      Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa ) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiffs allege violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.   This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

8.      Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

3

9.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

10.     Plaintiff Charlene Jones is, and has been continuously throughout all times relevant hereto, the owner of Accuride common stock.  Charlene Jones is a citizen of Tennessee.

11.     Defendant Accuride is a Delaware corporation and maintains its principal executive offices at 7140 Office Circle, Evansville, Indiana.  The Company is a leading supplier of components to the North American and European commercial vehicle industries.   Accuride's common stock is traded on the New York Stock Exchange under the ticker symbol "ACW."

12.     Defendant Richard F. Dauch ("Dauch") has served as President and Chief Executive Officer ("CEO") and a director of Accuride since February 1, 2011.

13.     Defendant John W. Risner ("Risner") has served as Chairman and a director of Accuride since 2010.  Risner is also a member of the Audit Committee and Nominating and Corporate Governance Committee.

14.     Defendant Robert E. Davis ("Davis") has served as a director of Accuride

since 2013.  Davis serves as the representative of Accuride's largest stockholder, Cetus Capital, LLC, and was appointed to the Accuride Board pursuant to that certain Investors Agreement, dated December 19, 2012.  Davis is also the Chairman of the Compensation and Human Resources Committee.

15.     Defendant Lewis Kling ("Kling") has served as a director of Accuride since 2012.  Kling is also the Chairman of the Nominating and Corporate Governance Committee.

16.     Defendant Robert J. Adams ("Adams") has served as a director of Accuride since 2013.  Adams is also the Chairman of the Audit Committee.

17.     Defendant Keith E. Busse ("Busse") has served as a director of Accuride since 2010.  Busse is also a member of the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee.

18.     Defendant James R. Rulseh ("Rulseh") has served as a director of Accuride since 2013.  Rulseh is also a member of the Audit Committee and the Compensation and Human Resources Committee.

19.     The defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Individual Defendants."  By virtue of their positions as directors and/or officers of Accuride, the Individual Defendants are in a fiduciary relationship with Plaintiff and the other public stockholders of Accuride.

20.     Crestview Partners is a leading New York based private equity firm.

21.     Parent is a Delaware corporation created solely for purposes of effectuating the Proposed Transaction, and does not maintain a principal place of

business.

22.    Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.  Merger Sub is a shell corporation that was created solely for purposes of effectuating the Proposed Transaction, and does not maintain a principal place of business.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings Counts I and II as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public stockholders of Accuride (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.    This action is properly maintainable as a class action.

25.    The Class is so numerous that joinder of all members is impracticable. As of August 30, 2016, there were approximately 48,245,946 shares of Accuride common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.    Questions of law and fact are common to the Class, including, among others: (i) whether defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy; and (ii) whether defendants will irreparably harm Plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are

typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' abilities to protect their interests.

29.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

30.     Accuride is a leading supplier of components to the North American and European commercial vehicle industries.  The Company designs, manufactures and markets commercial vehicle components, including commercial vehicle wheels and wheel-end components and assemblies, truck body and chassis parts, and other commercial vehicle components.  Accuride's products are marketed under brand names including Accuride, Gunite and Brillion, which it recently sold.

31.     On May 3, 2016, the Company held an earnings call where it discussed its first quarter results for 2016. Defendant Dauch announced that the Company

"delivered financial results that were within our expectations" but admitted that Accuride was up against some challenging market conditions. The Company's overall adjusted earnings before interest, depreciation, taxes, and amortization ("EBITDA") was down as compared to last year primarily because of the difficulties faced by the Company's Brillion Iron Works, Inc., ("Brillion").   The recent downward trends affecting the oil, gas, and mining industries resulted in worse than expected performance on the part of Brillion. Despite these difficulties, Accuride reported strong operational performance as its North America plants achieved strong operational goals. These performances culminated in multiple Supplier of the Year Awards from truck and trailer original equipment manufacturers ("OEM"), as well as aftermarket distributors.

32.    The earnings call also discussed that Accuride was positioning itself as a key player outside of the North American market. The Company had, on November 3, 2015, acquired a majority stake in steel wheel manufacturer Gianetti Ruote S.r.l. from the MW Italia wheels division of CLN S.p.A ("Gianetti"). This transaction, effectively a partnership, gave Accuride long-term supply contracts with key global OEM customers in Europe, which fits neatly into Accuride's long-term strategy to become a leading wheel supplier in the global market. After taking this majority holding, the Company focused on initiating a turnaround plan designed to generate higher levels of performance from Gianetti. In its earnings call on May 3, 2016, Accuride described the progress that it has made in making Gianetti more successful than before by implementing turnaround plans and generating higher levels of

8

performance. Defendant Dauch reported that this implementation is right on schedule.

33.     The Company is positioned for future growth and success.  For example, on July 26, 2016, the Company held an earnings call discussing its second quarter results. The Company disclosed net sales of $164 million, which was down $21 million from the second quarter of 2015. This decrease was due to the decrease in demand for the Brillion business unit, pricing related to the pass through of lower raw material cost, and lower demand in North America for wheels and other products. Brillion was experiencing difficulties, on no fault of the Company, because of the recent slowdown in the oil, gas, agricultural, and mining industries. Brillion's largest customer is heavily involved in the oil and gas industry and is most of the reason why the Company's net sales were down. Very recently, on September 2, 2016, Accuride announced that it had successfully sold Brillion.

34.     The Company also disclosed, among other things, that the EverSteel wheel treatment had begun to show tremendous potential for success for the Company. EverSteel is the Company's revolutionary wheel treatment and coating technology which, for the first time ever, allows a steel wheel manufacturer the ability to warranty its steel wheels against corrosion. According to the Company's website, an EverSteel wheel is treated with a proprietary technology that treats steel to prevent corrosion and even keep corrosion that may form contained if the coating is ever compromised. The Company launched its EverSteel program in January, 2016 and has had "numerous discussions with large fleet [sic] in the Midwest, Northeast

and Canada."

35. EverSteel technology stands to change the industry, as never before have steel wheel manufacturers been able warranty their products against corrosion. Consumers evidently agree, as the Company also announced on July 26, 2016 that it received its first major order of EverSteel wheels to equip two-hundred trucks and two-hundred trailers from a large Midwest fleet. Multiple other fleets were conducting field test programs with EverSteel and the Company was actively promoting this technology as Defendant Dauch himself "spent the last ten weeks out visiting key fleet owners and WDs in Texas, Indiana, New Jersey, Alabama, Mississippi and a few Mid-Western states." Indeed, Company management is confident that EverSteel will allow Accuride to gain back market share. Its confidence is fortified by the fact that EverSteel wheels offer consumers a smart investment which Defendant Dauch describes as confronting consumers with a "pay me now or pay me later" ultimatum meaning that an investment in EverSteel wheels will pay off in the long term due to avoided costs because of the corrosion-resistant technology.

36. Defendant Dauch concluded the earnings call by reiterating the fact that Accuride's EverSteel is the best in class technology relating to steel wheel coating which will enable the Company to grow profitably and capture a larger portion of the market. Defendant Dauch stated that "[f]leets have been wild by the money they think they can save thanks to longevity and corrosion resistance by these wheels when they're coated with EverSteel."

37. The excitement over EverSteel technology's anticipated success had

begun to come to fruition due to its EverSteel program, and this new technology would mostly likely result in increased market share.  The one thing that appeared to be holding the Company back from reaching its maximum financial potential is its Brillion business, which again has had worse than expected performance due to the recent downward trends effecting the oil, gas and mining industries.  However, the Company had been in the process of selling its Brillion business, which it successfully completed on September 2, 2016.  However, instead of waiting for the Company's market share to increase to its true value without the financial burden of its Brillion business, therefore maximizing shareholder value and the price per share of the Company, the Company instead decided to sell at an opportunistic time for the buyer, forever foreclosing shareholders from benefiting from the future success of the Company.

***The Flawed Process Leading to the Proposed Transaction***

38.    As set forth in the Proxy, the Proposed Transaction is the result of a flawed sales process that was singularly focused on a transaction with Crestview.

39.    The Company began to evaluate its business strategy and prospects throughout 2014.  From June 2014 to June 2015, the Company's management held numerous meetings with potential strategic parties and financial sponsors to discuss the Company's business, strategy and growth opportunities.

40.    The Company began to evaluate its business strategy and prospects throughout 2014.  From June 2014 to September 2015, the Company's management held numerous meetings with potential strategic parties and financial sponsors to

discuss the Company's business, strategy, and growth opportunities.

41.     Between November 2014 and July 2015, Defendant Dauch, along with various Company management, met with a strategic party, Strategic Party A, and five financial sponsors, Financial Sponsor Party A, Financial Sponsor Party B, Financial Sponsor Party C, Financial Sponsor Party D, and Financial Sponsor Party E.  Of these parties, Financial Sponsor Parties B, C, and D signed confidentiality agreements with customary standstills; Financial Sponsor Party A signed a confidentiality agreement with a "sunset" provision; and Financial Sponsor Party E signed a confidentiality agreement, though the Proxy is silent as to whether or not it contained a standstill provision.

42.     On July 6, 2015, Financial Sponsor Party C submitted a non-binding indication of interest ("IOI") to acquire the Company for $4.85 per share, which it increased the following day to $5.00 per share.  On July 8, 2015, Financial Sponsor Party D submitted a non-binding IOI to acquire the Company for a range between $5.25 and $5.50 per share.

43.     On July 10, 2015, the Company Board held a special telephonic meeting during which they discussed, among other things, these IOIs.  At the conclusion of the meeting, the Board determined to engage outside advisors in connection with the strategic process, and on July 23, 2015, the Board decided to engage Deutsche Bank to serve as the Company's financial advisor.    The Board then authorized Deutsche Bank to reach out to potentially interested parties.

44.     After the meeting, Deutsche Bank reached out to four strategic parties,

including Strategic Party A, Strategic Party B, and two additional strategic parties, Strategic Party C and Strategic Party D, and four financial sponsors, including Financial Sponsor Party C, Financial Sponsor Party D, and two additional financial sponsor parties, Financial Sponsor Party F and Financial Sponsor Party G, to gauge their interest in a potential transaction with the Company.  Each of Financial Sponsor Party D, Financial Sponsor Party F, Strategic Party A, Strategic Party B and Strategic Party C indicated interest in moving forward in the process. Strategic Party D and Financial Sponsor Party G indicated that they were not interested in exploring a potential transaction for a variety of reasons, including its concerns about a lack of strategic fit and an inability or unwillingness to offer a price for the Company that would likely be viewed as attractive.  Further, Financial Sponsor Party C informed the Company's financial advisor that it was not willing to participate in a competitive process.

45.     Strategic Parties A, B, and C, and Financial Sponsor Party F all entered into confidentiality agreements containing customary standstill provisions.

46.     By the end of August 2015, there was substantial dislocation in the financial markets generally, impacting equity capital markets and availability of acquisition and other debt financing.  Beginning in September 2015, published reports of estimated production levels for Class 8 truck builds suggested the beginning of a cyclical downturn in the commercial vehicle industry and market that the Company serves, and causing a drop in the Company's stock price.

47.     On September 14, 2015, Strategic Party B submitted a preliminary

13

nonbinding proposal to acquire the Company at a cash price of $4.05 per share. Strategic Party C submitted a preliminary nonbinding proposal to acquire the Company at a proposed range of $3.40 to $3.90 per share, which would be payable in cash, Strategic Party C equity or a combination thereof to be agreed upon at a later date. However, Strategic Party A, Sponsor Party D, and Financial Sponsor Party F indicated they did not wish to move forward in the process.

48.     On September 16, 2015, the Board held a special telephonic meeting to review the results of the strategic alternatives process. After discussions, the Board determined that the Company would continue to execute on its standalone business plan at that time.

49.     On October 15, 2015, Defendant Dauch and Risch ("Risch"), then Chief Financial Officer of the Company, met with representatives of Financial Sponsor Party C to provide a general update on the Company's business. The representatives of Financial Sponsor Party C expressed their view that the Company's leveraged balance sheet was limiting its strategic growth options and that the Company should divest its Brillion business in the near term. The Company then discussed a divestiture of its Brillion business at a Board meeting on October 27, 2015, and communicated such to Financial Sponsor Party C on November 5, 2015.

50.     In December 2015, the Company again began to meet with potential interested parties, and through February 2016 the Company met with Financial Sponsor Parties A, C, D, H, and I, and Strategic Party E, who entered into an amendment to extend its prior confidentiality agreement.

51.     The Company also met with and entered into confidentiality agreements with financial Sponsor Party J, whose confidentiality agreement contained a customary standstill provision, and Financial Sponsor Party K, but the Proxy is silent as to whether it also contained a standstill provision.

52.     The Board held a regularly scheduled meeting on February 24, 2016, during which they discussed the Brillion business.  Recognizing the impact the Brillion business was having on the Company, the Board authorized management to move forward on a process to sell the Brillion business.

53.     In March 2016, Defendant Dauch and Michael Hajost ("Hajost"), the Company's current CFO, met with Financial Sponsor Party G, and Financial Sponsor Party J, both of whom indicated they were not interested in pursuing a strategic transaction with the Company at this time, and Financial Sponsor Party D, who advised the Company it was only willing to consider a potential private investment in the Company, but not an acquisition.  Defendant Dauch had a telephone discussion with Financial Sponsor Party K, who indicated it was not interested in pursuing a strategic transaction with the Company.

54.     On March 10, 2016, Financial Sponsor Party L contacted the Company's financial advisor to express interest in exploring a potential strategic transaction.

55.     On March 14, 2016, Defendants Risner and Dauch, along with the Company's financial advisor, met with Financial Sponsor Party C, who indicated it was not interested in the acquisition of the Company on a standalone basis, but might be interested in completing an acquisition of the Company in the context of a

concurrent strategic acquisition or other third party business combination arranged by the Company.  Defendants Dauch, Risner and Davis also met with Strategic Party E, who also indicated it was not interested in pursuing a strategic transact at that time.

56.     On March 17, 2016, the Company's financial advisor, following outreach, had discussions with Crestview.  During the meeting, Crestview indicated it was interested in learning more about the status of the Company's operations and future growth opportunities, and expressed interest in receiving more information about the Company in the context of exploring a potential strategic transaction.

57.     On March 21, 2016, Financial Sponsor Party L entered into a confidentiality agreement with a standstill provision, but was allowed to make proposals to the Board on a confidential, non-public basis without limitation.

58.     In April 2016, the Company met with Strategic Parties F and B, who both declined interest in a strategic transaction with the Company.

59.     On April 21, 2016, Crestview entered into a confidentiality agreement with customary standstill provision.  The Company then held a meeting with Crestview on May 3, 2016, to explore strategic transaction opportunities with the Company.

60.     During the month of May 2016, the Company's management and financial advisor participated in further discussions with representatives of Strategic Party B, Financial Sponsor Party A, Financial Sponsor Party C, and Financial Sponsor Party L, and also initiated discussions with Financial Sponsor Party M and

16

Financial Sponsor Party N, among other parties, to explore whether such parties would be interested in pursuing strategic transactions with the Company.  After discussions, Financial Sponsor Parties L and N indicated they were not interested in a transaction, and Financial Sponsor Parties M and N entered into confidentiality agreements with standstill provisions that did not include a "sunset" provision.

61.     On June 3, 2016, Financial Sponsor Party M submitted an indication of interest to acquire the Company at a price in the range of $2.05 to $2.75 per share in cash, which price assumed, among other things, net cash proceeds of $40 million from the Brillion sale and that the Company remained on track to achieve $79.3 million in adjusted EBITDA for 2016.

62.     On June 7, 2016, Crestview submitted an indication of interest to acquire the Company at a price of $3.65 per share in cash, which price was conditioned upon the successful sale of Brillion (assuming a divestiture for $40 million of estimated net sales proceeds), as well as completion of due diligence and negotiation of definitive transaction documentation. The Crestview proposal requested that the Company enter into a limited period of exclusivity with Crestview.

63.     On June 8, 2016, The Board held a special telephonic meeting during which the Board discussed, among other things, Crestview's proposal.  The Board then requested that the Company's legal advisors negotiate a form exclusivity agreement with Crestview's legal advisor, Kirkland & Ellis LLP ("K&E").  The Board also instructed the Company's financial advisor to contact Financial Sponsor Party M to indicate that it would need to increase its proposal substantially for the

Company to move forward at that time. The Board reviewed the status of discussions with other potentially interested parties and instructed the Company's management and financial advisor to reach out to each of Strategic Party B, Financial Sponsor Party C and Financial Sponsor Party A to explore whether such party would submit an indication of interest in the near term for a strategic transaction.

64.    On June 9, 2016, Crestview's legal advisor circulated a proposed exclusivity agreement providing for an initial 30 day exclusivity period, subject to automatic extension in certain circumstances.  The two companies negotiated back and forth over the next few days regarding the terms of the exclusivity agreement. Also on June 9, 2016, the Company's financial advisor had discussions with Financial Sponsor Party M, who indicated it was not in a position to move forward on an increased offer basis, and Defendant Dauch contacted representatives of Strategic Party B, who indicated it did not have a strong interest in pursuing an acquisition of the Company at that time.

65.    On June 11, 2016, Financial Sponsor Party C indicated it was not interested in pursuing a transaction.  On June 13, 2016, the Company's financial advisor informed Financial Sponsor Party A that the Company was in discussions with another potentially interested party that were progressing rapidly, at which time Financial Sponsor Party A indicated it was not in a position to submit a proposal on an accelerated timeline.

66.    Later that day on June 13, 2016, the Board held a special telephonic meeting during which the Board approved the exclusivity agreement with Crestview,

which did not contain an automatic extension and allowed the Board to retain a "fiduciary out" to terminate the exclusivity agreement in response to a superior proposal.  The next day, the Company then entered into the exclusivity agreement with Crestview.  The Board also authorized the formation of an "ad hoc" transaction committee of the Board (the "Ad Hoc Transaction Committee"), comprised of Defendants Risner, Davis and Adams, which would administer and oversee the day-to-day process for the Crestview transaction and act as a Board-level resource for the Company's management and the financial and legal advisors.

67.    On June 24, 2016, the Board held a special telephonic meeting during which they discussed the sale of Brillion.  During the meeting, Board decided to move forward with "Brillion Buyer A", who offered a price of $25 million.

68.    That same day, the Company's legal advisor sent the first draft of the proposed Merger Agreement to Crestview's legal advisor.  Among other terms that were customary for a public company acquisition agreement, the proposed agreement included a 45 day go-shop period, a contemplated "two-tiered" termination fee with a lower termination fee payable for terminations during the go-shop period (as well as after the go-shop period for an exempted person) and limited matching rights for Crestview in response to superior proposals.

69.    On June 30, 2016, Crestview's legal advisor sent a revised draft of the Merger Agreement to the Company's legal advisor, in addition to certain ancillary transaction documents. The revised Merger Agreement proposed certain terms that were customary.  The revised draft of the Merger Agreement contained, amongst

other things, (i) a 30-day go-shop period, (ii) expanded matching rights with respect to any superior proposal, (iii) a termination fee of $10 million if the Company terminates the Merger Agreement in connection with a superior proposal during the go-shop period or with respect to an exempted person and $15 million after the end of the go-shop period or in connection with a change of recommendation by the Board, (iv) a reverse termination fee of $15 million, and (v) a new provision requiring the Company to reimburse Crestview for its reasonable expenses in an amount not to exceed $5 million if the Merger Agreement was terminated in certain circumstances. Crestview also requested that Cetus Capital, L.L.C. and certain of its affiliates, including Defendant Davis (collectively, "Cetus"), who at the time beneficially owned approximately 17.3% of the shares of the Company's outstanding stock, enter into a voting agreement with respect to the proposed merger.)

70.     Between June 2016 and August 2016, the Company and Crestview negotiated the terms of the Merger Agreement. The Ad Hoc Transaction Committee also continually approved an extension to Crestview's exclusivity agreement in light of continuing negotiations and unanticipated delays with the sale of Brillion.

71.     On July 18, 2016, Crestview submitted a nonbinding proposal for a *substantially* reduced price of $2.60 per share in cash, citing, among other things, the Company's reduced estimate for 2016 Adjusted EBITDA, as well as the reduced estimated net proceeds from the Brillion sale. Crestview reiterated that it would not enter into definitive transaction documentation prior to signing and closing of the Brillion sale. Crestview then increased its offer slightly on July 23, 2016 to $2.80 per

20

share.

72.     Also on July 18, 2016, Defendant Dauch met with Financial Sponsor
Party H, who asked about a potential equity investment in the Company as a means
to facilitate the Company's growth strategies and refinancing of the Company's
existing indebtedness.

73.     On July 25, 2016, Brillion Buyer A submitted a revised offer for a
reduced price of $15 million, causing further delays in the merger discussions with
Crestview.  This also resulted in Crestview further reducing its offer price to $2.55
per share on August 10, 2016.

74.     On August 16, 2016, at the direction of the Ad Hoc Transaction
Committee, the Company's financial advisor negotiated with Crestview for an
increase in the proposed purchase price of up to $0.25 per share, as well as other
material legal issues in the draft Merger Agreement.  The next day, Crestview did in
fact increase its offer price, but only ***slightly*** to $2.60 per share.  The Ad Hoc
Transaction Committee held a telephonic meeting on August 18, 2016, during which
they instructed the Company's financial advisor to request a further increase to $2.65
per share, as well as seek (i) a termination fee of approximately $3 million if the
Company terminates the Merger Agreement in connection with a superior proposal
during the go-shop period or with respect to an exempted person and $6 million after
the end of the go-shop period or in connection with a change of recommendation by
the Board, (ii) a reverse termination fee of $22.5 million, and (iii) expense
reimbursement in an amount not to exceed $500,000.

75.     On August 20, 2016, Crestview delivered a revised proposal to the Company, which it characterized as its "best and final" offer, which included a proposed purchase price of $2.60 per share, subject to adjustment based on the net proceeds received by the Company from the sale of Brillion. Crestview's revised offer also included (i) a termination fee of $4 million if the Company terminates the Merger Agreement in connection with a superior proposal during the go-shop period or with respect to an exempted person and $8 million after the end of go-shop period or in connection with a change of recommendation by the Board, (ii) a reverse termination fee of $16 million, and (iii) expense reimbursement in an amount not to exceed $3.5 million.  The companies then negotiated for a reduced expense reimbursement equal to no more than $1.3 million, and a reduced reverse termination fee of $12 million.

76.     Also on August 20, 2016, Brillion Buyer A reduced its offer price to $14 million, causing Crestview to reduce its offer price *again* to $2.58 per share.

77.     On August 29, 2016, the Board held a special meeting in Chicago, Illinois attended by the Company's management and financial and legal advisors, as well as the Company's separate financial advisor for the Brillion sale process.  During the meeting, the Board and other participants discussed both the Brillion and Crestview transactions.   After discussion, the Board authorized the Company's management and financial and legal advisors to finalize both the Brillion sale transaction and the Crestview transaction and to present both transactions for approval by the Board as promptly as possible.

78.     From August 30, 2016 through September 1, 2016, the parties and their

respective legal advisors worked to finalize the Merger Agreement and other ancillary agreements. Proposed execution versions of the Merger Agreement were circulated on the evening of September 1, 2016, in advance of the Board meeting called to consider approval of the Crestview transaction.

79.     On the evening of September 1, 2016, the Board held a special telephonic meeting attended by the Company's management and financial and legal advisors. The Company's management provided an update on the final terms of the Brillion sale transaction. The Company's legal advisor updated the Board on the final revisions to the Merger Agreement that had been negotiated between the parties' respective legal advisors. The Ad Hoc Transaction Committee reported to the full Board that it was supportive of, and recommended that the full Board approve, the Crestview transaction. Representatives of the Company's financial advisor then reviewed its financial analysis and rendered its oral opinion to the Board (which was subsequently confirmed by delivery of a written opinion dated as of September 2, 2016) that the $2.58 per share was fair, from a financial point of view.

80.     In the morning of September 2, 2016, immediately after the signing and closing of the Brillion sale transaction, each of the Company, Parent and Merger Sub executed and delivered the Merger Agreement and the other ancillary documents to which they are a party. Cetus also executed and delivered the voting agreement pursuant to which it agreed to vote in favor of the Merger.

81.     The Company then issued a press release announcing the execution of the Merger Agreement prior to the opening of trading on September 2, 2016.

*The Inadequate Proposed Transaction and Deal Protection Provisions*

82.     Despite the Company's prospects for future growth and success, the Board caused the Company to enter into the Merger Agreement for inadequate consideration.

83.     To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Crestview and are calculated to unreasonably dissuade potential suitors from making competing offers.

84.     Indeed, despite the fact that they conducted a flawed sales process prior to signing the Merger Agreement, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing in the Merger Agreement to a limited "go-shop" period of ***only*** 35 calendar days, hardly providing enough time for a third party to come forward and negotiate an Acquisition Proposal.  This go-shop period is followed by a strict "No Solicitation" provision that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Further, pursuant to Section 5.3(a) of the Merger Agreement, the Company must advise Crestview, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Section 5.3(a) and (b) of the Merger Agreement states:

> (a) Notwithstanding anything to the contrary contained in this Agreement, during the period beginning on the date of this Agreement

and continuing until 11:59 p.m. (New York City time) on the day that is 35 calendar days following the date of this Agreement (the "Solicitation Period End Date"), the Company, its Subsidiaries, directors, officers, employees and other Representatives shall have the right to, directly or indirectly, (A) solicit, initiate, facilitate and encourage any Acquisition Proposals or the making thereof, including by way of furnishing nonpublic information to any Third Party pursuant to (but only pursuant to) one or more Acceptable Confidentiality Agreements; provided, however, that any non-public information concerning the Company or its Subsidiaries provided or made available to any Third Party shall, to the extent not previously provided or made available to Parent or Merger Sub, be provided or made available to Parent or Merger Sub as promptly as reasonably practicable (and in no event later than twenty-four hours) after it is provided or made available to such Third Party; and (B) enter into, continue or otherwise participate in any discussions or negotiations with a Third Party with respect to any Acquisition Proposal or otherwise cooperate with or assist or participate in or facilitate any such discussions or negotiations or any effort or attempt to make any Acquisition Proposal.

(b)  Except as expressly permitted by this Section 5.3, from and after the Solicitation Period End Date, the Company shall, and shall cause its Subsidiaries and Representatives to, (x) immediately cease and cause to be terminated any discussions or negotiations with any Third Party that may be ongoing with respect to any Acquisition Proposal, and (y) deliver a written notice to any such Third Party to the effect that the Company is terminating all discussions and negotiations with such Third Party with respect to any Acquisition Proposal, and requesting that such Third Party promptly return or destroy all confidential information concerning the Company and its Subsidiaries.  Except as expressly permitted by this Section 5.3, from and after the Solicitation Period End Date until the Effective Time, or, if earlier, the termination of this Agreement in accordance with Article 7, the Company shall not, and shall cause its Subsidiaries and its and its Subsidiaries' respective directors, officers and employees not to, and shall use its reasonable best efforts to cause its other Representatives not to on behalf of the Company, (x) initiate, solicit, facilitate or knowingly encourage any Acquisition Proposal or the making or submission thereof, or (y) engage in, continue or otherwise participate in any discussions or negotiations with a Third Party regarding any Acquisition Proposal (other than to inform any Third Party of the existence of the provisions contained in this Section 5.3), or (z) furnish or provide any nonpublic information in connection with, any Acquisition Proposal.

85.    Therefore, if a third party makes an Acquisition Proposal that is deemed superior to Crestview's, Crestview had unfettered access to this proposal and can easily make a topping offer, all but ensuring it's offer is the superior offer.

86.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Parent a "matching right" with respect to any "Superior Proposal" made to the Company.  Sections 5.3(c) of the Merger Agreement provides:

> (e) Notwithstanding anything to the contrary contained in Section 5.3(b), if the Company has received a bona fide written Acquisition Proposal (other than as a result of a breach of this Section 5.3) (excluding any immaterial, unintentional violations)) from a Third Party (including an Exempted Person) that the Company Board (or any duly authorized committee thereof) determines in good faith, after consultation with its financial advisors and outside legal counsel, constitutes a Superior Proposal, the Company Board may, at any time prior to the receipt of the Company Stockholder Approval, effect a Change of Board Recommendation with respect to such Superior Proposal and terminate this Agreement pursuant to Section 7.1(f), subject to the requirements of this Section 5.3(e). The Company shall not be entitled to effect a Change of Board Recommendation pursuant to this Section 5.3(e) or terminate this Agreement pursuant to Section 7.1(f) unless:
>
> > (i) the Company Board shall have determined in good faith, after consultation with its outside legal counsel, that the failure to make such  a Change of Board Recommendation in response to the receipt of such Superior  Proposal  would  reasonably  be expected  to  be  inconsistent  with  its  fiduciary  duties  under applicable Law;
> >
> > (ii) the Company shall have provided to Parent at least three Business Days' prior written notice (the "Notice Period") of the Company's  intention to take such actions, which notice shall specify the basis for such Change of Board Recommendation, the identity of the Third Party making such Superior Proposal, the material terms and conditions of such  Superior  Proposal,  and

shall include a copy of the most current draft of the Company Acquisition Agreement to be entered into in respect of such Superior Proposal and any other material documents with respect thereto;

(iii) during the Notice Period, if requested by Parent, the Company shall have, and shall have caused its Representatives to have, engaged in good faith negotiations with Parent and its Representatives regarding any amendments or modifications to this Agreement proposed in writing by Parent and intended to cause the relevant Acquisition Proposal to no longer constitute a Superior Proposal; and

(iv) at the end of such Notice Period, the Company Board shall have considered in good faith any proposed amendments or modifications to this Agreement (including a change to the price terms hereof) and the other agreements contemplated hereby that may be irrevocably offered in writing by Parent (the "Proposed Changed Terms") no later than 11:59 a.m., New York City time, on the last day of the Notice Period, and shall have determined in good faith, after consultation with its financial advisors and outside legal counsel, that the Superior Proposal would continue to constitute a Superior Proposal if such Proposed Changed Terms were to be given effect and that failure to make a Change of Board Recommendation with respect to such Superior Proposal would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law.

In the event of any change to the price terms or any other material revision or amendment to the terms of such Superior Proposal, the Company shall be required to deliver a new written notice to Parent and to again comply with the requirements of this Section 5.3(e) (which shall apply mutatis mutandis) with respect to such new written notice.

87.     Further locking up control of the Company in favor of Crestview is Section 7.3 of the Merger Agreement, which contains a provision for a "Termination Fee" of up to $8 million, payable by the Company to Crestview if the Individual Defendants cause the Company to terminate the Merger Agreement pursuant to the

lawful exercise of their fiduciary duties.

88.     Additionally, the Company further locked up the Proposed Transaction in favor of Crestview and entered into a voting agreement ("Voting Agreement") with Cetus, and Defendant Davis as its representative.   According to the Voting Agreement, Defendant Davis, through Cetus, has agreed to vote his shares, which amount to approximately 17% of the Company's total shares, in favor of the Proposed Transaction.

89.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

90.     Moreover, certain officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.  For example, Defendant Dauch and the members of the Accuride leadership team will continue to lead the business after the transaction closes.

91.     The consideration to be paid to Plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

92.     Furthermore, the Proposed Transaction consideration fails to adequately compensate the Company's stockholders for the significant synergies created by the merger.  For example, Alex Rose ("Rose"), Partner at Crestview and co-head of the firm's industrials strategy, has stated that, "We are thrilled to have

the opportunity to partner with Rick Dauch and the rest of Accuride's terrific management team to help take Accuride to the next level.  This acquisition results in a de-levered Accuride, providing the company with greater flexibility to pursue growth around the world. Crestview has had great success backing strong industrial companies that are embarking upon global expansion strategies and we look forward to helping Accuride's management team execute on their vision for the company's future."

93.     Further, on October 7, 2016, Coliseum Capital Management ("Coliseum"), the largest shareholder of Accuride with an ownership of approximately 19% of the outstanding stock, announced that it had sent a letter to the Accuride Board stating its strong opposition to the Proposed Transaction with Crestview.  The letter stated that Coliseum believed the transaction "materially undervalues the Company, is the wrong strategic choice for Accuride and is not in the best interests of shareholders."  Further, Coliseum adamantly stated, "We will be voting against the transaction."  The letter further stated:

> Now is the wrong time to sell Accuride. The Company has made substantial investments over the past five and a half years, spending over $150 million to upgrade manufacturing facilities and successfully restore its customer relationships. We believe that the truck market is at a cyclical low, but when the cycle turns the Company will be well-positioned to harvest the benefits of the hard work and investment. Shareholders who patiently supported these investments should participate in the upside.
>
> Accuride's prospects as an independent company are strong. The Company's own projections (disclosed in the preliminary proxy) forecast 2018 Adjusted EBITDA of $98 million. Using the Company's blended Total Enterprise Value multiple of 5.5x (calculated from the

fairness analysis of its financial advisor) produces a conservative valuation of $5.00 per share, which equates to a 94% return over the next two years. Furthermore, these projections do not incorporate any material deleveraging or additional value contributed by acquisitions, which could further enhance returns – benefits that would be captured by Crestview as a result of the transaction.

94.     Additionally, on October 10, 2016, Accuride announced the expiration of its "go shop" period under the merger agreement, which expired on October 7, 2016. The Company is now precluded from further engaging in discussions or soliciting alternative acquisition proposals.  This is especially detrimental to shareholders given that Coliseum, Accuride's largest shareholder, believes this deal is not in the best interest of the Company's shareholders.

95.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

96.     As a result, the stockholders will not receive adequate or fair value for their Accuride common stock in the Proposed Transaction.

***The Materially Incomplete and Misleading Registration Statement***

97.     Defendants filed the Proxy with the SEC in connection with the Proposed Transaction on September 30, 2016.  As discussed below and elsewhere herein, the Proxy omits material information that must be disclosed to Accuride's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

98.     Notably, the Proxy fails to disclose certain projected financial information prepared by Accuride management and relied upon by Deutsche Bank.

Specifically, with respect to these projections, the following items should be disclosed: (i) all calculations used in Deutsche Bank's *Sum-of-the-Parts Selected Transaction* Analysis; (ii) corporate overhead figures; (iii) pension-adjusted EBITDA; (iv) stock-based compensation; (v) reconciliation of general accepted accounting principles ("GAAP") net income to non-GAAP unlevered free cash flow ("UFCF") and non-GAAP pension-adjusted EBITDA; (vi) the definition/formula for UCFC used by management, if it is different from that which is disclosed in Deutsche Bank's *Discounted Cash Flow Analysis*; and (vii) the treatment of stock-based compensation expense.

99.     The omission of this information renders the following information, found on page 60 of the Proxy, materially misleading:

**Management Projections**

| | Year Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2016F** | **2017F** | **2018F** | **2019F** | **2020F** |
| | | | *(in millions)* | | |
| Total Revenue | $    570 | $    587 | $    665 | $    740 | $    808 |
| Adjusted EBITDA[(1)] | $      76 | $      77 | $      98 | $    116 | $    134 |
| Capital Expenditures | $      25 | $      37 | $      40 | $      43 | $      24 |
| Unlevered Free Cash Flow | $      37 | $      35 | $      36 | $      40 | $      72 |

(1)   Accuride defines Adjusted EBITDA as net income or loss before income tax expense or benefit, interest expense, net, depreciation and amortization, noncontrolling interest in subsidiaries, restructuring, severance, and other charges, impairment, and currency losses, net. Adjusted EBITDA should not be considered an alternative to net income (loss) or other traditional indicators of operating performance and cash flows determined in accordance with accounting principles generally accepted in the United States ("GAAP").

The following table presents a reconciliation of net income to Adjusted EBITDA for each of the periods indicated above in the Management Projections:

| | Year Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2016PF** | **2017F** | **2018F** | **2019F** | **2020F** |
| | | | *(in millions)* | | |
| Net Income (Loss) | $      (3) | $        0 | $      18 | $      35 | $      48 |
| Interest Expense, net | $      33 | $      33 | $      32 | $      30 | $      31 |
| Income tax Provision | $        1 | $        2 | $        3 | $        5 | $        5 |
| Depreciation and Amortization | $      41 | $      40 | $      41 | $      40 | $      43 |
| Restructuring, severance and other items related to our credit agreement | $        5 | $        2 | $        2 | $        2 | $        2 |
| Gianetti Minority Interest | $      (1) | $        1 | $        3 | $        4 | $        5 |
| **Adjusted EBITDA** | $      76 | $      77 | $      98 | $    116 | $    134 |

100.    These statements are rendered false and/or misleading by the omissions

identified above because without full access to the underlying inputs used in calculating Accuride's unlevered free cash flow, the Company's shareholders cannot reliably compare the intrinsic value of the Company to the proposed Merger Consideration offered by Crestview, and thus cannot determine whether the Proposed Transaction is indeed fair, as Defendants and Deutsche Bank allege in the Proxy. Moreover, these projections form the backbone of the *Discounted Cash Flow Analysis* prepared by Deutsche Bank in its fairness opinion.

101.   It is well-settled that management's financial projections are the lifeblood of the Company and are crucial to providing stockholders with management's inside view of the Company's value and future prospects. Stockholders are entitled to know about the Company's promising future financial prospects before being asked to vote on the Proposed Transaction.  This expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the company.  This is particularly true when the stockholders will be cashed out of the Company, because unlike a stock transaction, the stockholders will have no participation in the success of the future combined companies.  Therefore, it is important to know what management and the company's financial advisor's best estimate of those future cash flows would be.  Moreover, such forecasts are material to Plaintiff and other reasonable investors because, in addition to the few line item projections disclosed in the Proxy, Deutsche Bank reviewed and relied upon the omitted projections in preparing their fairness opinion.  This data is

necessary for making an informed decision about whether to support the Proposed Transaction and, thus, must be disclosed

102.     The Proxy also fails to disclose material information in the *Summary of Material Financial Analyses of Deutsche Bank*. The information disclosed provides a minimal summary of the presentation Deutsche Bank gave to the Company and was thus relied on by both Deutsche Bank and the Defendants when evaluating the Proposed Transaction. Specifically, with respect to financial information regarding Accuride's value before and after consummation of the Proposed Transaction the following items should be disclosed: (i) a valuation summary detailing: (a) the calculation of Accuride's fully-diluted shares; (b) the equity value of Accuride at both the unaffected price and at the offer price; (c) the total enterprise value of Accuride at both the unaffected price and at the offer price; (d) and the pension-adjusted total enterprise value of Accuride at both the unaffected price and at the offer price; and (ii) any other pricing multiples that may have been used by Deutsche Bank in completing the Fairness Opinion in the Proxy.

103.     Further, the Proxy discusses that Deutsche Bank performed a pension-adjusted total enterprise value but omits why a pension adjustment was necessary as well as the details of the calculations upon which the adjustments were based.

104.     These omissions render the Proxy false and/or misleading because, as noted *supra,* Deutsche Bank relied on the full presentation when giving its opinion as to the Proposed Transaction and the Defendants relied on this opinion when deciding to enter into the proposed transaction.

105.   The Proxy further omits material information with respect to the opinions and analyses of Deutsche Bank as well as the process and events leading up to the Proposed Transaction.   This omitted information, if disclosed, would significantly alter the total mix of information available to Accuride's stockholders.

106.   In particular, with respect to Deutsche Bank's *Selected Companies Analysis*, the Proxy fails to disclose: (i) objective selection criteria that display the observed company-by-company pricing multiples and financial metrics; (ii) the pension adjustments that were applied to the selected companies' enterprise values and the EBIDTA; (iii) the multiples calculated without accounting for pension adjustments; (iv) justification for the pricing multiples selected for Accuride toward/below the low end of observed multiples of the selected companies any other multiples that may have been used; (v) why a *Sum-of-the-Parts Selected Transactions Analysis* was considered necessary for transaction and discounted cash flow, but not for the *Selected Companies Analysis*; and (vi) whether other multiples were calculated, and if so, what they were.

107.   The omission of this information renders the following information, found on page 56 of the Proxy, materially misleading:

*Selected Companies Analysis*

Deutsche Bank reviewed and compared certain financial information and commonly used valuation measurements for Accuride with corresponding financial information and valuation measurements for the following eight publicly-traded commercial and light vehicle component manufacturing companies:

| | |
|---|---|
| Allison Transmission Holdings Inc. | Meritor Inc. |
| Commercial Vehicle Group, Inc. | Iochpe-Maxion SA |
| Dana Inc. | Superior Industries International Inc. |
| Modine Manufacturing Co | WABCO Holdings Inc. |

Although none of the above selected companies is directly comparable to Accuride, for the purpose of selecting the companies for this analysis, Deutsche Bank utilized its professional judgment and experience as investment bankers, taking into account several factors, including, among other things, Accuride's operational capabilities and financial profile compared with those of the selected companies, the competitive landscape in which Accuride and the selected companies operate and Accuride's product offerings and those of the selected companies. Accordingly, the analysis of publicly traded comparable companies was not simply mathematical. Rather, it involved complex considerations and qualitative judgments, reflected in the opinion of Deutsche Bank, concerning differences in financial and operating characteristics of the selected companies and other factors that could affect the public trading value of such companies.

Based on the closing prices of the common stock or common equity of each of the selected companies on August 31, 2016, information contained in the most recent public filings of the selected companies and analyst consensus estimates of pension-adjusted EBITDA for calendar years 2016 and 2017 for each of the selected companies, Deutsche Bank calculated the following multiples with respect to each of the selected companies:

- pension-adjusted TEV as a multiple of estimated 2016 pension-adjusted EBITDA; and
- pension-adjusted TEV as a multiple of estimated 2017 pension-adjusted EBITDA.

Deutsche Bank also calculated the same multiples for Accuride based upon Accuride management estimates excluding the Brillion Iron Works division.

The results of this analysis are summarized as follows:

| | PENSION-ADJUSTED TEV / PENSION ADJUSTED EBITDA | |
| --- | --- | --- |
| | 2016E | 2017E |
| Selected Comparable Companies | | |
| High | 12.7x | 11.9x |
| Median | 6.5x | 6.4x |
| Median (excluding Allison Transmission and WABCO) | 6.2x | 6.1x |
| Low | 5.5x | 4.9x |
| Accuride (management estimates) | 5.7x | 5.4x |

Based in part upon the multiples of the selected companies described above and taking into account its professional judgment and experience, Deutsche Bank calculated the following ranges of implied values per share of Accuride common stock using the treasury stock method:

- approximately $0.98 to $2.48 per share of Accuride common stock by applying multiples of pension-adjusted TEV to estimated 2016 pension-adjusted EBITDA of 5.25x to 6.25x to Accuride management estimates of 2016 pension-adjusted EBITDA and adding approximately $11.7 million of anticipated net proceeds from the Brillion transaction; and
- approximately $1.03 to $2.61 per share of Accuride common stock by applying multiples of pension-adjusted TEV to estimated 2017 pension-adjusted EBITDA of 5.0x to 6.0x to Accuride management estimates of 2017 pension-adjusted EBITDA and adding approximately $11.7 million of anticipated net proceeds from the Brillion transaction.

56

108. The omission of the information identified above renders this section of the Proxy materially misleading because shareholders have no way of determining whether the selected range of multiples applied by Deutsche Bank have a valid basis and are reasonable in light of the fact they fall outside the range of multiples (or outside the median range) for the comparable companies.

109. With respect to Deutsche Bank's *Sum-of-the-Parts Selected Transactions Analysis,* the Proxy fails to disclose; (i) the objective selection criteria and the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics; (ii) why Deutsche Bank made the decision to apply observed pension-unadjusted total enterprise value/last twelve month EBITDA multiples to Accuride on a pension-adjusted bases; (iii) pension-adjusted multiples if they were in

fact calculated; (iv) how Deutsche bank distributed expenses between Accuride's steel and aluminum wheels sector and the wheel-end components and assemblies sector and how much expenses went to each section; and (v) whether last twelve month corporate expenses were reduced due to the sale of Brillion, if so by how much, and if not then why not.

110.   The omission of this information renders the following information, found on pages 56-57 of the Proxy, materially misleading:

*Sum-of-the-Parts Selected Transactions Analysis*

Deutsche Bank performed a sum-of-the-parts precedent transaction analysis by deriving ranges of implied values for each of Accuride's Wheels segment (steel and aluminum wheels sector), Accuride's Gunite segment (wheel-end components and assemblies sector), and corporate overhead costs associated with such segments. Deutsche Bank reviewed publicly available information relating to four acquisition transactions in the steel and aluminum wheels sector and twelve acquisition transactions in the wheel-end components and assemblies sector (each a "Selected Transaction," and together, the "Selected Transactions").

**Steel and Aluminum Wheels Sector**

| Date Announced | Target | Acquirer |
|---|---|---|
| October 21, 2013 | Carlisle Companies Incorporated (Transportation Products Division) | American Industrial Partners |
| August 10, 2012 | Titan Europe P.L.C. | Titan International Inc. |
| October 5, 2011 | Hayes Lemmerz International | Iochpe-Maxion SA |
| August 4, 2009 | ArvinMeritor (wheel manufacturing segments) | Iochpe-Maxion SA |

**Wheel-end Components and Assemblies Sector**

| Date Announced | Target | Acquirer |
|---|---|---|
| Pending | Haldex AB | SAF Holland SA |
| February 29, 2016 | Pittsburgh Glass Works, LLC | LKQ Corporation |
| November 3, 2014 | Qualitor, Inc. | Wellspring Capital Management LLC |
| April 28, 2014 | Standyne Corporation (Fuel Filtration division) | CLARCOR Inc. |
| January 21, 2014 | Affinia Group Inc. (Chassis Component division) | Federal-Mogul Corporation |
| January 7, 2014 | Honeywell International Inc. (Friction Materials division) | Federal-Mogul Corporation |
| September 27, 2012 | Tomkins Industries, Inc. (Dexter Axle business) | Sterling Group Partners III, L.P. |
| August 29, 2012 | HHI Group Holdings, LLC | American Securities LLC |
| March 16, 2012 | Schrader International Inc. | Madison Dearborn Partners LLC |
| November 1, 2006 | Pacifica Group Ltd. | Robert Bosch GmbH |
| July 20, 2004 | Dana Corporation (Automotive Aftermarket Group) | The Cypress Group LLC |
| August 1, 1999 | Varlen Corporation | Amsted Industries Incorporated |

Although none of the Selected Transactions is directly comparable to the Merger, the companies that participated in the Selected Transactions were selected by Deutsche Bank based upon its professional judgment and experience as investment bankers and its knowledge of transactions of a similar nature and are such that, for purposes of analysis, the Selected Transactions may be considered similar to the Merger.

With respect to each Selected Transaction and based on publicly available information, Deutsche Bank calculated the multiples of the target's TEV to last twelve months ("LTM") EBITDA (or, in the case of the Hayes Lemmerz transaction, Wall Street consensus estimates of estimated 2011 EBITDA).

The results of this analysis are summarized as follows:

| Steel and Aluminum Wheels | TEV/LTM EBITDA |
|---|---|
| High | 5.2x |
| Median | 4.4x (4.8x excluding Hayes Lemmerz) |
| Average | 4.3x (4.7x excluding Hayes Lemmerz) |
| Low | 3.4x |

| Wheel and Components and Assemblies | TEV/LTM EBITDA |
|---|---|
| High | 8.2x |
| Median | 6.6x |
| Average | 6.7x |
| Low | 5.0x |

Based in part upon the multiples of the Selected Transactions described above, and taking into account its professional judgment and experience, Deutsche Bank calculated ranges of estimated implied values per share of Accuride common stock by applying multiples of (a) 5.0x to 6.0x to Accuride's $87.0 million LTM Adjusted EBITDA for its Wheels segment, (b) 6.5x to 7.5x to Accuride's $25.4 million LTM Adjusted EBITDA for its Gunite segment, and (c) 5.3x to 6.3x to Accuride's $(30.9) million LTM Adjusted EBITDA for its corporate overhead (which was based on a weighted average of the multiples applied to the Wheels and Gunite segments), in each case as of June 30, 2016 as provided by management of Accuride, deducting net debt and minority interest and adding approximately $11.7 million in anticipated net proceeds from the Brillion transaction. This analysis resulted in a range of implied value on a combined basis, using the treasury stock method, of approximately $2.89 to $4.51 per share of Accuride common stock without taking into account pension and other post-retirement liabilities, or approximately $1.75 to $3.36 per share of Accuride common stock after adjusting for the full amount of Accuride's pension and other post-retirement liabilities.

111.   Lastly, with respect to Deutsch Bank's *Discounted Cash Flow Analysis,* the proxy fails to disclose: (i) the underlying assumptions used to calculate the weighted average cost of capital ranges for both of Accuride's steel and aluminum

wheels section and the wheel-end components and assemblies sector; (ii) whether the unlevered free cash flows used in the *Discounted Cash Flow Analysis* are consistent with the projections contained in the section of the Proxy entitled *Certain Financial Projections* and in the alternative if they are inconsistent explain why and provide a reconciliation between the figures Deutsche Bank used and those provided by management; (iii) an explanation as to the purpose of the mid-cycle performance estimates, how they were estimated, and why they are appropriate; (iv) an explanation as to how stock-based compensation was treated in the calculation of EBITDA, pension-adjusted EBITDA, and unlevered free cash flow; (v) what "other assets and liabilities" were changed and made a component of the unlevered free cash flow calculation; (vi) why the Iochpe-Maxion SA date was omitted from the weighted average cost of capital calculation; (vii) the implied terminal pricing multiples corresponding to the selected range of perpetuity growth rates.

112.   The omission of this information renders the following information, found on page 58 of the Proxy, materially misleading:

*Discounted Cash Flow Analysis*

Deutsche Bank performed a discounted cash flow analysis to determine a range of implied net present values per share of Accuride common stock. Deutsche Bank (a) applied discount rates ranging from 10.0% to 11.0% to estimates of the future unlevered free cash flows of Accuride (excluding its Gianetti and mixed metal composite technology businesses) for the period June 30, 2016 through June 30, 2021, using the mid-year convention, and to a range of estimated terminal values for Accuride (excluding its Gianetti and mixed-metals composite technologies businesses) at the end of such period based upon Accuride management's long-term "mid-cycle" performance estimates and (b) applied discount rates ranging from 14.5% to 15.5% to estimates of the future unlevered free cash flows of Accuride's Gianetti and mixed metal composite technology businesses for the period June 30, 2016 through June 30, 2021, using the mid-year convention, and to a range of estimated terminal values for the Gianetti and mixed metal composite technology businesses at the end of such period based upon Accuride management's long-term "mid-cycle" performance estimates to determine a range of implied enterprise values for Accuride as of June 30, 2016. For purposes of its financial analyses, Deutsche Bank calculated unlevered free cash flow as (a) pension-adjusted EBITDA less depreciation and amortization, (b) less taxes on such amount, plus (c) depreciation and amortization, less (d) capital expenditures, less (e) change in net working capital, and less (f) where applicable, change in other assets and liabilities. Deutsche Bank derived the foregoing range of discount rates utilizing a weighted average cost of capital analysis based on certain financial metrics for Accuride and the selected companies described above other than Iochpe-Maxion SA. The terminal values were calculated using perpetuity growth rates ranging from 1.5% to 2.5%. Deutsche Bank then subtracted Accuride's estimated net debt, the minority interest in Accuride's Gianetti business and pension liabilities as of June 30, 2016, added approximately $11.7 million of anticipated net proceeds from the Brillion transaction, and divided the result by the number of fully diluted shares of Accuride common stock outstanding using the treasury method. This analysis resulted in a range of implied present values of Accuride common stock as of June 30, 2016 of approximately $1.83 to $3.68 per share.

113.    These statements are rendered false and/or misleading by the omissions identified above for a variety of reasons.  First, stock-based compensation can have an impact on the calculation of EBITDA, and UFCF, and therefore it is important to know how it was treated in these calculations.   Second, the multiples and corresponding range of perpetuity growth rates could have a meaningful impact on the conclusions presented in Deutsche Bank's DCF Analysis.   Accordingly, it is important that Accuride shareholders be provided insight into the reasonableness of Deutsche Bank's discretionary use of the multiples and ranges.

114.    The Proxy is materially incomplete and misleading because it omits the information identified in ¶¶ 95-111.

115.    These material inputs and assumptions that were used by Deutsche Bank in the financial analyses supporting its fairness opinion presented to the Board are critical to Accuride's stockholders' ability to assess the credibility and efficacy of Deutsche Bank's analyses upon which the Board relied in recommending the Proposed Transaction and are necessary to provide stockholders with a fair summary of Deutsche Bank's analyses and work.

116.    For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT I

**(On Behalf of Plaintiff and the Class Against Accuride and the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder)**

117.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

118.   Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.  Each of the defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses performed by Deutsche Bank in support of its fairness opinion, and the background leading up to the Proposed Transaction.

119.   In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

120.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.     Specifically, and as detailed in ¶¶ 95-111 above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the projected financial information prepared by Accuride's management and relied upon by Deutsche Bank in its financial analyses supporting its fairness opinion; and (ii) key inputs and assumptions underlying Deutsche Bank's financial analyses.

122.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Deutsche Bank reviewed and discussed its financial analyses with the Board during its August 30, 2016 meeting, and further states that the Board considered both the financial analyses provided by Deutsche Bank as well as Deutsche Bank's fairness opinion and the assumptions made and matters considered in connection therewith.   The Individual Defendants knew or should have known that the material information identified in ¶¶ 95-111 above has been omitted from the Proxy, rendering the sections of the Proxy identified in ¶¶ 95-111 above to be materially incomplete and misleading.

123.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.   Plaintiff and the Class have no adequate remedy at law.   Only

through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**(On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934)**

124.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

125.    The Individual Defendants acted as controlling persons of Accuride within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Accuride, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

126.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

128.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

129.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

130.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

131.   Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.   Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.   Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company: (i) adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's shareholders; and (ii) discloses the material information discussed above which has been omitted from the Registration Statement;

C.   In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.   Directing defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.   Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  October 20, 2016                 Respectfully submitted

                                         RILEY WILLIAMS & PIATT, LLC


                                         /s/  James A. Piatt
                                         William N. Riley (#14941-49)
                                         James A. Piatt (#28320-49)
                                         301 Massachusetts Avenue
                                         Indianapolis, IN  46204
                                         Tel:    317-633-5270
                                         Fax:  317-426-3348
                                         Email:        wriley@rwp-law.com
                                                       jpiatt@rwp-law.com

                                         *Attorneys for Plaintiff*


**LEVI & KORSINSKY, LLP**
Shane T. Rowley (to be admitted *pro hac vice*)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (212) 363-7500

*Attorneys for Plaintiff*


45